# EXHIBIT 1

## Declaration of Special Agent Brian J. Christ

I, Brian J. Christ, hereby state as follows:

1. I make this declaration in support of an application for an order permitting agents to coordinate with a storage facility to facilitate the return of household goods to certain customers.

2. I am a Special Agent with the United States Department of Transportation ("USDOT"), Office of Inspector General ("OIG"), in Columbus, Ohio. I have been employed as a USDOT-OIG Special Agent for approximately four years. I have successfully completed criminal investigator training at the Federal Law Enforcement Training Center in Glynco, Georgia. As a Special Agent, I conduct criminal investigations of individuals and entities for possible violations of federal criminal laws, particularly those laws found in Titles 18 and 49 of the U.S. Code that are relevant to the USDOT, Federal Motor Carrier Safety Administration ("FMCSA"). FMCSA responsibilities include monitoring and enforcing compliance with regulations governing safety and commerce related to interstate motor carriers, in particular Title 49, Code of Federal Regulations, Part 375, which governs the transportation of household goods by motor carriers.

3. The facts set forth in this declaration are based on my own investigation, which includes my own personal observations and knowledge; target and witness interviews; written witness complaints; documents provided by witnesses; documents and information obtained through search warrants; information from FMCSA database systems; information I have received from other agents and investigators; and my training and experience. This declaration is intended to show merely that there is probable cause that customer goods are being stored in

**EXHIBIT 1**

the Subject Property and return of the property is not possible without a Court order.

4.      Beginning in 2016, the USDOT and the FBI initiated an investigation into members of a criminal organization involved in the shipment of household goods, following hundreds of complaints to the USDOT by customers-victims. The criminal organization used theft, fraud, extortion, and threats of violence to further their moving and storage businesses (the "Enterprise") in violation of 18 U.S.C. § 1962(d). On July 25, 2018, the investigation culminated in the indictment of twelve individual defendants: Andrey Shuklin, Serghei Verlan, Phyllis Ricci Quincoces (a/k/a "Faith Ashford," "Grace Rubestello," "Phyllis Ricci," "Phyllis Ann"), Evgenia Kukuy (a/k/a "Jenny K," "Evgenia Kukuv"), Vladimir Pestereanu (a/k/a "Vova"), Ievgen Kariaka (a/k/a "Eugene"), Akhliddin Kalonov, Roman Iakovlev, Sanjar Fayzivey, Sergey Bocharov, Jessica Martin (a/k/a "Emma Ricci," "Mary Austin"), and Seth Nezat (a/k/a "Andrew Johnson," "Andrew Butler," "Jason," "Kyle Walker"), who were charged with RICO Conspiracy in violation of 18 U.S.C. § 1962(d).

5.      The defendants operated and worked through affiliated companies, such as JBR Underground, LLC, United National Moving and Storage, National Relocation Solutions, Independent Van Lines, National Relocation Van Lines, US Relocation Systems, First National Moving and Storage, Public Moving and Storage, Public Moving Services, Smart Relocation Solutions, Presidential Moving Services, Unified Van Lines, and Flagship Van Lines (hereinafter, the "affiliated companies") to move interstate shipments of household goods. The affiliated companies operated as a single-corporate entity, all managed and operated by the same owners, leadership, and employees.

6.      The purpose and object of the conspiracy was for the defendants to enrich themselves and the Enterprise by defrauding and extorting customers who hired the Enterprise to

2

move their household goods. The Enterprise operated within the Southern District of Ohio and throughout the country. Generally, the scheme worked as follows: the Enterprise started a company that represented itself falsely through emails to customers and representations on their website as a moving company with over a decade of experience and many satisfied customers. The Enterprise then induced new customers to select its services by undercutting competition with a low "binding" moving estimate without first conducting an onsite inspection of household goods. Pursuant to federal regulations, the binding estimate cannot be changed once movers begin loading. However, in contravention of the law, the Enterprise routinely increased the price of the binding estimate on site, after household goods were loaded on the moving trucks.

7. Through customer interviews, agents learned that after loading the household goods, the affiliated "moving company" would falsely claim that the goods weigh more and/or take up more cubic footage than contemplated in the binding estimate. The company then extorted the customers into paying an inflated "revised" price to get their goods delivered. The extortion scheme was successful. By waiting until the goods were loaded to increase the price, the customers were vulnerable and desperate. Some customers were told that if the inflated price was not paid in full, the company would keep the household goods. The company has followed through with its threats to keep the household goods of customers who refused to pay the (inflated) revised price, and their goods have not been delivered, sometimes years after the move. For example, agents executing a premises search warrant on May 31, 2017 at the 5150 Duff Dr., West Chester, 45246, warehouse location found household goods from a move that took place on May 24, 2016; the customers have never received their household goods, despite the Enterprise receiving a down payment for delivery of the goods. To date, there are over 900 identified victims of the Enterprise. My review of customer documents indicates the Enterprise increased

3

the price above the binding estimate in well over 90% of the moves for which there is adequate documentation.

8. While providing an initial, false, low bid to induce business with no intention of adhering to the estimate was fraudulent, internal documents show the price increase was fraudulent as well. A review of internal documents indicates that the newly calculated cubic feet number is false. Evidence recovered during the execution of a search warrant indicates that the company often tracks the "real" or "actual" cubic feet in contrast to the cubic feet charged to the customers. For example, it was the practice of certain defendants to email to one another documentation indicating the "actual" or "real" cubic footage used in a move, alongside documentation indicating a higher amount of cubic footage that the Enterprise used as the basis for the amount charged to the customer.

9. Once enough customers complained and/or USDOT placed that company out of service as set forth in the Indictment, the Enterprise stopped operating as that particular moving company. The evidence shows that the Enterprise then "reincarnated" as a new company by submitting false documents to federal regulators and then, once again, misrepresenting the new company's years of service and qualifications to induce victims to use the Enterprise's moving services. The Enterprise has reincarnated as at least twelve different FMCSA-regulated companies since 2013—the affiliated companies as set forth above—all operating as a single entity.

10. According to customer interviews, the Enterprise at times simply refused to deliver a customer's household goods despite receiving payment as agreed to by the parties; losing both their payment for the move and their household goods, the customer had little recourse because the Enterprise reincarnated under a new name every several months. The

4

Enterprise has even threatened violence when doing so furthers the criminal conspiracy, including a bomb threat against employees of a company that operates a warehouse in Maryland where the Enterprise stored certain customers' household goods.

11. One of the defining characteristics about the Enterprise has been concealment—the Enterprise's efforts to conceal its identity, the identity of its leadership, and the true nature of its business. Documents filed with federal authorities repeatedly concealed the true owners of the Enterprise and its ties to past moving businesses that were shut down. In fact, the Enterprise even created counterfeit driver's licenses for individuals it named as owners of "reincarnated" new affiliated companies on federal regulatory filings. Members of the Enterprise also repeatedly concealed their true identities from customers. For example, during execution of a search warrant at the Enterprise's Florida location, agents recovered a list of aliases used by employees. The documents had columns that included the actual name of the employee and the "Name" or "Sales Name"—that is, the alias—that the employee used. For example, the documents indicated that "Phyllis," known by agents to be Defendant Phyllis Quincoces, went by the name "Faith Ashford (GM)," and the "Sales Name" of "Grace Rubestello." This was confirmed in an interview with Quincoces, in which she admitted, in substance and in part, that she used the names Faith Ashford and Grace Rubestello as aliases when working on behalf of the Enterprise. The document indicates that, at that time, roughly two dozen employees used an alias or Sales Name. By frequently reincarnating the Enterprise, the Enterprise concealed the true nature of its business from both federal regulators and customers.

12. Law enforcement agents have identified the following storage unit where the Enterprise currently stores victims' household goods: Extra Space Storage, 4723 S. Emerson Ave., Indianapolis, IN 46203, Unit 409 (the "Subject Property").

13. Based on the investigation, the Subject Property contains the belongings of two customers of Flagship Van Lines, Merlinda Baker and Anil Kumar. As set forth above, Flagship Van Lines is an affiliated company of the Moving Enterprise.

14. Specifically, I have spoken with Melinda Baker and she stated, in substance and in part, that she was a customer of Flagship Van Lines. On June 26, 2018, Flagship Van Lines took possession of Baker's household goods pursuant to their agreement. Those goods were never delivered.

15. According to the records I reviewed, which were obtained from several search warrants, an individual the investigation indicates worked for the Moving Enterprise sent an email to Defendant Andrey Shuklin and other members of the Enterprise regarding Merlinda Baker's belongings. The email indicated that Merlinda Baker's belongings were at the Subject Property. The email also indicated Baker was charged for using 877 cubic feet, but her goods only used 650 cubic feet. Baker's documents from the move were attached to the email, and the subject of the email was "K1871403," which was Baker's job number for the move given by the Enterprise.

16. According to Extra Space Storage records, the storage unit was rented by Alex Lushchyk, phone number (786) 277-3396. The investigation indicates Lushchyk worked for the Moving Enterprise. For example, my review of bank records for the Moving Enterprise indicates that Lushchyk received payments from the Moving Enterprise from as early as March 12, 2014 until 2018. Further, on September 27, 2018, I exchanged text messages with Lushchyk and he stated a different victim's belongings were located at a storage facility in Louisville, KY. That victim was later able to retrieve her belongings from that storage unit.

17. The investigation indicates that Kumar was also a customer of Flagship Van

Lines. On June 25, 2018, Flagship Van Lines took possession of Kumar's household goods pursuant to their agreement. Those goods were never delivered.

18. Documents seized from the Moving Enterprise indicate that Baker and Kumar are indeed customers of Flagship Van Lines.

19. On or around November 8, 2018, I exchanged text messages with Lushchyk and he stated that Baker's belongings and Kumar's belongings were being stored in the Subject Property.

20. After I had several conversations via text messages with Lushchyk regarding retrieving Baker's and Kumar's belongings, he quit responding and the belongings appear to still be in the Subject Property. Despite my repeated attempts to contact Lushchyk regarding the property, he has ceased all communication with me.

21. I have had repeated discussions with the representatives of the Subject Property. They have told me that they would not facilitate the return of the above-mentioned customer goods without a court order or consent from Lushchyk.

22. I have spoken with a number of customers of the Enterprise who have told me that they are in urgent need of their household goods and personal property, to include the victims who have their belongings stored in the Subject Property.

23. Based on the above, I believe there is probable cause that customer goods are being stored in the Subject Property, and return of those goods will not be effectuated without a Court order permitting their return.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 9th day of December, 2018.

Brian J. Christ, Special Agent
U.S. Department of Transportation
Office of Inspector General